No. 492.

## WEIDEMAN v. THE STATE.

CRIMINAL LAW.—*Frequenting House of Ill-Fame.*—*Sufficiency of Evidence to Sustain Conviction.*—The defendant, an old man 69 years of age, took up his residence with the keeper of a house of ill-fame and made a contract by which he deeded to her certain real estate in consideration that she would support him during his natural life and give him decent burial, etc., and he was to work for her as much as his strength would permit, and he was to assign to her a policy of insurance on his life, she agreeing to keep up the dues and assessments. He resided with her several months pursuant to said agreement. He was not connected with any lewdness during that time, and did not actively participate in any acts of prostitution, lewdness or carnal intercourse in or about said house, or in connection with any of the persons residing therein. He had been in the habit of selling farm products to the keeper of the house, and had known her in that way for two or three years prior to the making of the contract with her. The agreement as to the facts stated that during the day designated in the affidavit, and up to that day, the defendant knew the character of the house in which he was living. He was not related by blood or marriage to the keeper or any inmate of the brothel. He had sufficient means to support himself when he went to live in said house of ill-fame, and, although old and infirm, was not a person of unsound or weak mind.

*Held,* that the evidence warranted the conviction of the defendant for frequenting and visiting a house of ill-fame, and associating with females known or reputed as prostitutes, under section 2002, R. S. 1881, as amended in 1889. (Acts of 1889, p. 337.)

From the Porter Circuit Court.

*N. L. Agnew, S. C. Spencer* and *D. E. Kelly,* for appellant.
*A. G. Smith,* Attorney General, for the State.

BLACK, J.—This was a prosecution under section 2002, R. S. 1881, as amended in 1889, Acts of 1889, p. 337, by which it is provided as follows:

" Whoever being a male person, frequents or visits a house or houses of ill-fame, or of assignation; or associates with females known or reputed as prostitutes, or frequents or visits a gambling house or houses; or is engaged in or about a house of prostitution, shall be fined," etc.

The appellant was convicted before a justice of the peace, and on appeal to the court below, upon an affidavit, which, omitting some of its formalities, charged that he, on or about the 1st day of February, 1891, at, etc., did unlawfully frequent a house of ill-fame kept by one Skip Dutton, and did unlawfully visit a house of prostitution kept by one Skip Dutton, and did unlawfully associate with females known and reputed as prostitutes, to wit, Skip Dutton and Jennie Burnett, and was unlawfully engaged in and about a house of prostitution kept by one Skip Dutton, the appellant being a male person.

The cause was tried by the court. A motion for a new trial assigning that the finding was contrary to law and contrary to the evidence was overruled, and this ruling alone is assigned as error.

The evidence consisted of a written agreement as to the facts between the prosecuting attorney and the appellant.

This agreement, which was quite lengthy, stated the facts to be substantially as follows:

On the 25th of July, 1890, the appellant, being the owner of certain real estate in Porter county, Indiana, entered into a contract in writing with said Skip Dutton. Said contract recited that the appellant had that day deeded to said Skip Dutton certain real estate described, being forty-four acres of land in Porter county, Indiana; that said Skip Dutton agreed to support the appellant during his natural life, by giving him three good meals a day and furnishing him a room to sleep in, and at his death she was to give him a decent burial by the side of his wife in his lot in a certain burial ground in said county, and was to erect at his grave an appropriate and neat tombstone; and he was to work for said Skip Dutton as much as his strength would permit by doing odd jobs about the house and running errands for her, and she was to take care of him when sick; and he was to assign to her a certain policy of insurance on his life for one thousand dollars, or said policy was to be so changed that she should be

the beneficiary therein, she to pay the dues and assessments thereon during his life; that all the personal property of the appellant, consisting of one mare and one buggy " and some other articles of value," should be her property; that she should furnish him good and substantial clothing, and should furnish him from time to time small sums of money for his necessary incidental expenses.

At the time of the making of this contract, the appellant executed to said Skip Dutton a warranty deed for said forty-four acres of land, of the value of two thousand dollars, encumbered by mortgage in the sum of seven hundred dollars. Said deed purported to be made for the sum of one dollar and for the further consideration that the grantee should support the grantor during his natural life and at his death give him a decent burial and erect a tomb-stone at his grave, it being stipulated in the deed that the grantee might at any time sell said land and dispose of the proceeds as she saw fit.

On the 1st of August, 1890, said Skip Dutton executed to the appellant a mortgage on a certain lot in the city of Valparaiso, in said county, to secure the performance by her of the consideration of said deed, as therein expressed, said mortgage being set out in said written agreement as to the facts.

The appellant, pursuant to said agreement, took up his residence with said Skip Dutton at her place of residence in a certain locality in said city, and continuously resided there with her from the 25th of July, 1890, to the 1st of February, 1891, the date mentioned in the affidavit. During all that time the house was a house of ill-fame, and its inmates, Skip Dutton and Jennie Burnett, were persons of bad repute for chastity and virtue, and were known and reputed as prostitutes, and the house was resorted to for the purpose of prostitution, and was kept by said Skip Dutton as a house of prostitution. At the time of the trial, in June, 1891, the appellant was seventy years of age. During said period, from the 25th of July, 1890, to the 1st of February, 1891,

he was infirm and unable to earn his livelihood. He was not connected with any lewdness or associated with any persons for purposes of prostitution or lewdness, and during said time was not guilty of any acts of carnal intercourse, and did not actively participate in any acts of prostitution, lewdness or carnal intercourse in or about said house, or in connection with any of said persons residing therein. He knew the character of the house " during and up to February 1st, 1891." At the time he made said agreement and said deed he was worth fifteen hundred dollars. He was a German by birth and illiterate, and did not talk English fluently, but talked it so as to be able to converse intelligibly. Just prior to the time of making said contract he had considerable trouble with his children, and one with whom he was living drove him out of the house and assaulted and beat him. He had no home with his children and no other home. He made effort to obtain a home upon terms similar to those made with said Skip Dutton, but failed to do so. He " is a man of good morals, church member, and has not in any manner promoted the business of prostitution or encouraged the same during the time charged."

Prior to the time of making said contract he lived in the country, and had been a farmer all his life, and had lived the life of an ordinary farmer up to the death of his wife, which occurred a short time prior to the making of said contract. He was ignorant of the ways of city life. He had been in the habit of selling wood, vegetables and other farm products to said Skip Dutton at her house for the period of two or three years prior to the execution of said deed and said agreement, and had been at her house for the purpose of delivering such wood, etc., etc., to her. He had so known her for the period of two or three years before he began living with her.

In this statute before its amendment the male person committing the acts thereby made punishable was declared to be a " pimp," who, in the ordinary meaning of the word, is one

who provides for others the means of gratifying lust, a pander.

The language of the statute is very broad and general, yet, without doubt, in the application thereof to a given state of facts, reference must be had to the purpose or effect of the actions of the person accused under the statute.

A male person may visit or frequent a house of ill-fame, or associate with prostitutes, or be engaged in or about a house of prostitution for legitimate, proper and commendable purposes. A physician, a clergyman, a lawyer, a tradesman may do either or all these acts for the purposes of his calling, but not for the purposes of the calling of such lewd females or of the immoral business of such house.

It is noticeable that the agreed statement of facts does not clearly show when the appellant first knew the character of the house or of the females who occupied it. It does not fully set forth what the appellant did during his residence at said house. It states conclusions as to the character of his acts; that he had not in any manner promoted or encouraged the business of prostitution. He boarded and lodged at the house, and was engaged by his contract to work for the keeper of it as much as his strength would permit by doing odd jobs about the house and running errands for the keeper.

When he entered into the contract by which he turned over to the mistress of the house all his worldly possessions, he was about sixty-nine years old. He was not shown to be a person of unsound or weak mind. One of his children had turned him out, for whose fault does not appear. He had made an effort to effect an arrangement for his maintenance, which had failed. But he was possessed of property amply sufficient to procure support with decent people. He could converse intelligently in the English language. The fact that he was a church member would seem to indicate that he had been instructed in morality.

It is not easy to believe that a man sixty-nine years old, who had lived in two continents, who could talk the English language intelligibly, and who had reared a family of his own, could personally dispose of the products of his farm from time to time for two or three years to the keeper of a house of ill-fame, at such house, in a neighboring town, and be ignorant of her character or the character of her house.

It is not shown that he was thus ignorant, and there appears to be some effort in the statement of facts to indicate that the arrangement made by him with the woman of ill-fame was a *dernier* resort, to concede which would be a shameful admission, and contrary to common sense.

For a man of his age and intelligence, who has held the position of head of a family, whose wife lies in a neighboring church-yard, and whose children live in the same community, and who has affiliated with Christian people as such, thus to give over all his property and means of livelihood to a prostitute, and to become an inmate of her house of prostitution and a pensioner upon her bounty, is not merely a shameful dishonoring of his family, but a shocking indecency in the face of the entire community. This prosecution may be an expression of that community's outraged sense of decency. Only courtesans and those of their level can excuse such degradation. No loose notions of moral obligation, and no sympathy for individuals, inconsistent with the welfare of society, should influence the decisions of courts.

The conviction of the appellant can not be upheld unless his offence be within the meaning of the statute. Whether or not it can be held to be within the contemplation of the Legislature depends upon the proper determination as to whether or not the appellant's conduct can be said to countenance, aid and promote the immorality against which the statute is directed.

It is stated in the agreement as to the facts, that during the day designated in the affidavit, and up to that day, the ap-

pellant knew the character of the house in which he was living. He does not appear to be related by blood or marriage to the keeper, or any inmate of the brothel. Without good and sufficient reason he lives with a known prostitute, engaged in her service in and about her house of prostitution. It can not be said that he does not, to some extent, countenance, aid and promote her immoral calling and traffic.

The situation is, happily, an unusual one. The statute is broad enough in its terms, meaning and purpose to take it in.

The judgment is affirmed.

CRUMPACKER, J., took no part in the decision of this cause.

Filed Apil 1, 1892.